John M. HAIRSTON, Plaintiff–Appellant,

v.

The GAINESVILLE SUN PUBLISHING CO., Defendant–Appellee.

No. 92–2485.

United States Court of Appeals, Eleventh Circuit.

Dec. 21, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Feb. 16, 1994.

Rodney W. Smith, Alachua, FL, for plaintiff-appellant.

Steven Munger, Atlanta, GA, for defendant-appellee.

Before FAY and HATCHETT, Circuit Judges and JOHNSON, Senior Circuit Judge.

FAY, Circuit Judge:

This case involves a complaint filed pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. The district court granted summary judgment for the employer, holding that the employee had failed to comply with the applicable statute of limitations and further failed to establish a prima facie case of retaliatory suspension or retaliatory discharge. Appellant has abandoned (as time barred) those issues raised in the initial charge of age discrimination and appeals only the district court's determination as to the retaliation claims. We REVERSE the district court, finding that Appellant has established both a prima facie case of retaliatory suspension

and retaliatory discharge sufficient to withstand a motion for summary judgment.

## I. STATEMENT OF FACTS

Appellee, the Gainesville Sun ("Sun"), a newspaper of general daily circulation in Gainesville, Florida, hired John Hairston in the early 1970's. Appellant was assigned to manage the sports department, edit the content of the sports section and write a daily sports column. In February of 1987, John Fitzwater was hired as publisher of the Sun. A month later, Diane McFarlin joined the Sun as executive editor. A few days after McFarlin became executive editor, she advised Appellant that Bobby Tyler, twenty-eight years Appellant's junior, was to become the executive sports editor and assume that portion of Appellant's duty pertaining to the management of the sports department. McFarlin explained to Appellant that she preferred to have the administrative and operational functions of the sports department performed by an individual who would be in the office regularly. At that time, Appellant attached little significance to the structural change and accepted the stated purpose.

Thereafter, McFarlin began to criticize Appellant's work, recommending that he improve the length, variety, writing quality and content of his columns. Specifically, she requested that he shorten his columns, write fewer notes[1], clear the subject matter of each column with the new executive sports editor, Pat Dooley, and write less on University of Florida football.[2] The record contains evidence that Appellant attempted to comply with the new guidelines even though Appellant believed the criticisms were not well founded.

Appellant subsequently received numerous critical personnel memorandums and marginal performance evaluations, particularly an evaluation dated February 3, 1988. Appel-

lant responded to this evaluation with a memorandum challenging its validity and informing his superiors that he suspected the true reason for his low appraisal was age discrimination. Thereafter, a series of incidents involving Appellant occurred in 1989 to which Appellee attaches great importance and believes supports the disciplinary actions taken against Appellant.

The first incident occurred on July 22, 1989. Appellant wrote a sports column about a former University of Florida basketball player. The article stated Appellant's involvement in the procurement of a tryout for the ex-Florida player with the Orlando Magic basketball team. The most controversial sentence in the article reads, "... the Magic personnel department ... changed [its] mind on the matter when it was pointed out to [it] that [University of Florida] Gator coach Norm Sloan, the Gainesville Sun and others were interested enough ... to call the team about him." Appellees opined that it was improper and unethical for Appellant to call the Orlando Magic President or represent in the article that the Sun had an interest in the player being given a tryout.

The record, however, does not reveal whether Appellant represented to the Magic President that he was calling of behalf of the Sun, nor was the article written as an opinion column. Rather, the article attributes the above quotation to the player as a loose paraphrase of his explanation as to why he was afforded a tryout. It was subsequent to this article that McFarlin insisted the subject matter of each of Appellant's columns be approved by Dooley and edited prior to release.

The next incident occurred in October 1989, when the Sun was reporting on an NCAA investigation of the University of Florida basketball program. Appellant phoned[3] Norm Sloan, the Florida basketball

1. A "notes" column is a column that contains snippets of information concerning any number of topics.

2. From the record it appears as though Appellant had a commendable tenure on the Sun's staff. Appellant received the Associated Press Award for the best sports story of the year, the 1990 Burt McGrane Football Writing Award, and was

the only sports writer ever to be inducted into both the Gator Bowl and Citrus Bowl Halls of Fame.

3. There is some dispute as to whether Appellant was asked to call Norm Sloan. From the record it seems likely that Appellant was asked to call Sloan by his superiors as Appellant was not directly involved in the newspaper's report and

coach, to request an interview. During the interview, Sloan asked Appellant what he had heard about the NCAA investigation. Appellant responded that he had heard "nothing new."[4] McFarlin later learned of Appellant's "nothing new" statement to Sloan, concluded that such a revelation constituted a serious breach of confidentiality, and suspended him from any further involvement in the story or any coverage of any University of Florida sports for one week.

On October 27, 1989, Appellant filed a charge of age discrimination claiming he had been functionally demoted, harassed and denied wage increases because of his age. In December of 1989, Appellant again interviewed Sloan following his resignation as the University of Florida basketball coach. At the conclusion of the interview, Sloan stated to. Appellant that Fitzwater and McFarlin had told him they planned on "relieving Appellant of his duties." Appellant, having recently filed his discrimination action, asked Sloan if he would be willing to testify to that effect. Sloan agreed and Appellant later relayed this message to his attorney. That evening, Appellant wrote an article concerning the subject matter of the interview that day with Sloan.[5]

On July 27, 1990, Appellant's counsel took a sworn telephone statement from Sloan in support of Appellant's age discrimination charge against Appellee. On August 15, 1990, at the conclusion of the investigation of

the University of Florida athletic programs, Appellant wrote another column discussing the results of the NCAA investigation. The record suggests that this is around the time when Appellee learned of Sloan's willingness to testify on Appellant's behalf. On August 21, 1990, Gibson, the executive editor for Appellee, concluded that Appellant's August 15, 1990, column, written after Sloan had volunteered to testify for Appellant, created a conflict of interest.[6] The following day Gibson sent Appellant a memorandum outlining the alleged conflict of interest and stating his belief that Appellant's actions were a breach of journalistic ethics. Appellant responded to Gibson's memo on August 23, 1990, denying all accusations. On August 28, 1990, Appellant was placed on thirty (30) days suspension with pay.

On January 11, 1991, Appellant filed a new EEOC charge of discrimination, alleging that this suspension was nothing more than disciplinary action in retaliation for Appellant's having filed charges of age discrimination against the Sun. On January 29, 1991, Appellant filed his initial ADEA lawsuit in the Northern District of Florida.

On February 27, 1991, Appellant set up an interview luncheon meeting with Dale Brown, the Louisiana State University basketball coach. Following the interview, Brown reiterated his earlier offer to testify on Appellant's behalf.[7] Appellant later re-

---

4. Appellee alleges that Appellant had asked McFarlin about the status of the Sun's report on the NCAA investigation on October 11, 1989. McFarlin allegedly responded to Appellant's question by stating that the President of the University of Florida, "tells our people that there is nothing new."

5. Appellee contends that the column was favorable to Sloan and insinuates that it was so in exchange for Sloan's having agreed to testify on Appellant's behalf. A simple reading of the article reveals that the article is not overly complimentary, although certain sentences when taken out of context, may appear biased. This Court finds Appellee's suggestion that Appellant's articles written immediately following his interviews with both Sloan and Brown unethical extremely unpersuasive. It is entirely logical and perhaps customary for a columnist, such as Appellant, to

evidence suggests that other Sun reporters' phone calls had not been returned.

write an article about the subject matter of an interview conducted that day.

6. The record suggests that this was not Appellant's only column about Norm Sloan during the period prior to his suspension when he knew of Sloan's willingness to testify. However, Appellee has not alleged that any of the other articles created a conflict of interest. Furthermore, this court finds Appellee's conflict of interest argument a bit disingenuous, noting that immediately following Appellant's firing and with the knowledge that Dale Brown was going to testify on Appellant's behalf, the Sun published an article criticizing coach Brown's character and truthfulness.

7. The record indicates that Appellant did not initially react to Brown's February 1990 offer. Appellant states that he did not consider Brown as a potential witness until his February 1991 offer to testify, when Appellant needed character witnesses.

turned to his office to write a column concerning the subject matter of his interview with Dale Brown, which appeared in the February 28, 1991 edition of the Sun. Sometime between February 28, 1991 and June 4, 1991, Appellant submitted Brown's name, along with the names of many other South Eastern Conference coaches, to his attorney as possible character witnesses. On June 4, 1991, in Appellant's answers to Appellee's interrogatories, Appellant listed Dale Brown as a potential witness. Having received this information from Appellant, Gibson then reviewed Appellant's past columns. He declared Appellant's February 28, 1991, column concerning Brown and the LSU basketball team a direct contravention of his prior directives and an act of insubordination. On June 24, 1991, the Sun terminated Appellant's employment. The Sun stated that Appellant's termination was caused by his blatant disregard of Gibson's admonishment not to write about someone from whom he may receive a benefit.

Appellant then amended his initial complaint to include a count for retaliatory termination of employment. Appellant contends that Appellee's stated reasons for the suspension and termination were mere pretext, and that the underlying reason for the termination was in retaliation for having filed his initial age discrimination complaint. The district court granted summary judgment for the Sun on each of Appellant's four claims. Appellant has abandoned those issues raised in Count I of the amended complaint, and challenges only the district court's grant of summary judgment as to Counts II, III and IV. This Court REVERSES the district court's grant of summary judgment finding that material facts remain at issue as to Counts II, III and IV of Appellants amended complaint.

## II. DISCUSSION

### A. Standard of Review

The court of appeals reviews grants of summary judgment *de novo*, applying the same legal standard employed by the district court in the first instance. *Browning v. Peyton,* 918 F.2d 1516, 1520 (11th Cir.1990); *Warrior Tombigbee Transp. Co. v. M/V Nan*

*Fung,* 695 F.2d 1294, 1296 (11th Cir.1983) (citations omitted). Federal Rule of Civil Procedure 56(c) authorizes summary judgment when all "pleadings, depositions, answers to interrogatories, and admissions on file, together with he affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The seminal case regarding summary judgment states:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

■ The party seeking summary judgment bears the initial burden to demonstrate to the district court the basis for its motion for summary judgment and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions which it believes show an absence of any genuine issue of material fact. *Taylor v. Espy,* 816 F.Supp. 1553, 1556 (N.D.Ga.1993) (citation omitted). In assessing whether the movant has met this burden, the district court must review the evidence and all factual inferences drawn therefrom, in the light most favorable to the non-moving party. *Welch v. Celotex Corp.,* 951 F.2d 1235, 1237 (11th Cir.1992); *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1528 (11th Cir.1987). If the movant successfully discharges its burden, the burden then shifts to the non-movant to establish, by going beyond the pleadings, that there exist genuine issues of material facts. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986);

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

Applicable substantive law will identify those facts that are material. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. *Id.* For factual issues to be considered genuine, they must have a real basis in the record. *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1355–56. It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather determine whether such issues exist to be tried. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2135. The court must avoid weighing conflicting evidence or making credibility determinations. *Id.* at 255, 106 S.Ct. at 2513–14. Instead, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a general issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton*, 883 F.2d 923, 933–34 (11th Cir.1989) (citation omitted).

### B. The Age Discrimination in Employment Act

■ The ADEA forbids age discrimination in the employment of persons at least forty years of age but less than seventy years of age. 29 U.S.C. § 621 *et seq.* The Eleventh Circuit has adapted to issues of age discrimination the principles of law applicable to cases arising under the very similar provisions of Title VII. *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.1989). The burden of proof in Title VII retaliation cases is governed by the framework established in *McDonnell–Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Carter*, 870 F.2d at 581.

■ The substantive law of this Circuit dictates that a plaintiff alleging retaliation must establish a prima facie case[8] by showing: (1) a statutorily protected expression, (2) an adverse employment action, and (3) a causal link between the protected expression and the adverse action. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir.1993). Once plaintiff has established a prima facie case of retaliation, the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action. *Id.*

"If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted," *Burdine*, 450 U.S. at 255, 101 S.Ct. at 1095, and "drops from the case," *Id.* at 255 n. 10, 101 S.Ct. at 1095 n. 10. Placing this burden of production upon the defendant serves to frame the factual issues with sufficient clarity so that the plaintiff will have a 'full and fair opportunity to demonstrate,' through presentation of his own case and through cross-examination of the defendant's witnesses, "that the proffered reason was not the true reason for the employment decision." *St. Mary's Honor Center v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993) *citing Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. See also *Goldsmith*, 996 F.2d at 255–56.

Courts have recognized that in discrimination cases, an employer's true motivations are particularly difficult to ascertain, *see United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) (acknowledging that discrimination cases present difficult issues for the trier of fact, as "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes"), thereby making such factual determinations generally unsuitable for disposition at the summary judgment stage. *Lowe v. City of Monrovia*, 775 F.2d 998, 1009 (9th Cir.1985) (stating that very little additional evidence is required to raise a genuine issue of fact regarding motive, and concluding that summary judgment on the merits is ordinarily inappro-

---

8. The phrase "prima facie case" in the Title VII context denotes the establishment of a legally mandatory, rebuttable presumption. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 n. 7, 101 S.Ct. 1089, 1094 n. 7, 67 L.Ed.2d 207 (1981).

priate once a prima facie case has been established).

## C. The Prima Facie Case

■ The undisputed facts establish the first two elements of a prima facie case in regard to both the retaliatory suspension and retaliatory discharge allegations, Counts II and III respectively, of Plaintiff's Amended Complaint. In October of 1989, plaintiff filed a complaint with the EEOC, a statutorily protected participation. In August of 1990, plaintiff was the subject of an adverse employment action; he was suspended with pay for thirty days. On January 11, 1991, Appellant filed a new EEOC complaint and on January 29, 1991, Appellant filed the present ADEA case in federal court. Thereafter, Appellant suffered a second adverse employment action; to wit, he was discharged on June 24, 1991.

■ The district court held that Appellant failed to satisfy the third prong of the prima facie case; namely the establishment of a "causal link" between the protected statement and the adverse employment action. *Hairston v. Gainesville Sun*, No. 91–10040, Order of May 1, 1992. The district court stated that the "plaintiff has failed to meet the 'strict proof of causation' required by this circuit." *Id.* at 10 *citing Doyal v. Marsh*, 777 F.2d 1526, 1534 (11th Cir.1985). While it is true the court in *Doyal* determined that the plaintiff failed to substantiate the "causal link" necessary to establish a prima facie retaliation claim by a preponderance of the evidence, it did so only after five days of trial. *Doyal*, at 1532. This burden is patently different from Appellant's burden of establishing a "causal link" sufficient to survive a motion for summary judgment. As this Court observed:

> [T]he causal link in the [retaliatory discharge] formula [is not] the sort of logical connection that would justify a prescription that the protected participation in fact prompted the adverse action. Such a connection would rise to the level of direct evidence of discrimination, shifting the burden of persuasion to the defendant. Rather, we construe the 'causal link' element to require merely that the plaintiff

establish that the protected activity and the adverse action were not wholly unrelated.

*Simmons v. Camden County Board of Ed.*, 757 F.2d 1187, 1189 (11th Cir.), *cert. denied*, 474 U.S. 981, 106 S.Ct. 385, 88 L.Ed.2d 338 (1985) (emphasis in original). "At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action." *Goldsmith*, 996 F.2d at 1163.

Viewing all the evidence in the light most favorable to Appellant and resolving all inferences in his favor, as we must, this Court finds that the record, at the very least, establishes that Appellee was aware of Appellant's protected activities at the time the adverse employment action took place. This Court further finds that the record may support the proposition that the protected expression and the adverse employment action were not wholly unrelated. Therefore, we find that for the purposes of withstanding a motion for summary judgment, Appellant has carried his burden. Accordingly, we cannot affirm the district court's grant of summary judgment as to either the retaliatory suspension or retaliatory discharge claims.

■ At the summary judgment stage, assuming arguendo, that Appellee has articulated a legitimate, non-retaliatory reason for the adverse employment action, the burden then shifts back to Appellant to raise a genuine factual question as to whether Appellee's stated reason is mere pretext. *Miller v. Fairchild Industries, Inc.*, 797 F.2d 727, 732 (9th Cir.1986). Although a defendant's stated non-discriminatory reasons could potentially overcome any inference of discrimination or retaliation, the instant record is not so one-sided and is therefore not deserving of summary judgment.

## D. Pretext

■ The plaintiff may succeed by directly persuading the court at trial that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *McDonnell*, 411 U.S. at

804–05, 93 S.Ct. at 1825–26. In order to establish pretext, the plaintiff is not required to introduce evidence beyond that already offered to establish the prima facie case. *Miller,* 797 F.2d at 732 (citations omitted). Evidence already introduced to establish the prima facie case may be considered, and "[i]ndeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation" and establish pretext. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256 n. 10, 101 S.Ct. 1089, 1095 n. 10, 67 L.Ed.2d 207 (1981). Accordingly, the grant of summary judgment, though appropriate when evidence of discriminatory intent is totally lacking, is generally unsuitable in Title VII cases in which the plaintiff has established a prima facie case because of the "elusive factual question" of intentional discrimination. *Id.* at 256, 101 S.Ct. at 1095.

In the instant case, there exists evidence beyond that introduced to establish the prima facie case, which tends to suggest Appellee's proffered reasons were mere pretext. In particular, Appellant introduced evidence that prior to the filing of his complaints, he regularly received above average performance evaluations. Immediately preceding and following his filing of his administrative complaints, however, Appellant received numerous unfavorable performance evaluations and was subject to increased scrutiny and harassment from his supervisors. If proven at trial, such incidents would bear on the pretext issue. *See B. Schlei & P. Grossman, Employment Discrimination Law* 554 (2d ed. 1983) (noting that surveillance "strongly suggests the possibility of a search for a pretextual basis for discipline, which in turn suggests that subsequent discipline was for purposes of retaliation").

The burden to avoid summary judgment is not to show by a preponderance of the evidence that the reasons stated were pretext. Rather, plaintiff's burden at summary judgment is met by introducing evidence that could form the basis for a finding of facts, which when taken in the light most favorable to the non-moving party, could allow a jury to find by a preponderance of the

evidence that the plaintiff has established pretext, and that the action taken was in retaliation for engaging in the protected activity. Issues of fact and sufficiency of evidence are properly reserved for the jury. The only issue to be considered by the judge at summary judgment is whether the plaintiff's evidence has placed material facts at issue.

We find that Appellant has provided a sufficient factual basis in the record upon which a reasonable trier of fact may find that the stated reasons for the adverse employment actions were mere pretext. Accordingly, we REVERSE the District Court's entry of summary judgment as to Counts II, III, and IV of Appellant's Amended Complaint and REMAND this case to the District Court for trial.

Reversed and Remanded for trial.